CIVIL ACTION NO. 05-42-DLB

GLENN STEINKAMP, ET AL.                                    PLAINTIFFS


vs.                          OPINION AND ORDER


PENDLETON COUNTY, KENTUCKY, ET AL.                        DEFENDANTS

* * * * * * * * * * *

This is a § 1983 action with related state-law claims. Previously, the Court entered an order granting Defendants' summary judgment motions and denying Plaintiffs' motion for partial summary judgment. (Doc. #84). This Opinion and Order sets forth herein its reasons for doing so.

## I. Factual and Procedural Background

Plaintiff Glenn Steinkamp owns a towing business. At the time of the events underlying this case, he was going through a divorce. His then wife, Defendant Melissa Steinkamp, suspected he was having an affair with co-Plaintiff Rebecca Wolfe, the Pendleton County dispatcher. Melissa Steinkamp began turning over to authorities information about her husband that she believed evidenced criminal activity by him, some of which activity was allegedly undertaken with the assistance of the local Pendleton County Sheriff's Office. The authority Melissa Steinkamp turned to was the Pendleton County Attorney, Don Wells. He, in turn, had the Pendleton County Detective, Defendant Peter Samples, follow up with her; Samples then got the Defendant City of Butler, Kentucky, and its Police Chief, Defendant Kenneth Hale, involved. Based on Melissa

Steinkamp's reported information, various search warrants were sought, issued, and executed. Glenn Steinkamp challenges the constitutional validity of those warrants and the motivations of the authorities in seeking, acquiring, and executing them. The parties and their relationships are obviously sorted, as is sometimes seen in civil rights cases. This backdrop may make for interesting drama, but in this case as explained herein, the Court concludes it did not give rise to any viable civil rights violations.

Glenn Steinkamp resides in Falmouth, Pendleton County, Kentucky. At all relevant times, he has owned and operated a local business, Midwest Towing. He operated this business from the same real estate location as his residence. His wife Melissa participated in the business as an assistant and had access to the office and operations.

In November 2002 Melissa Steinkamp learned that Glenn was having an affair with Rebecca Wolfe, the Pendleton County Dispatcher. Upon learning this, Melissa contacted Rodney Miles, a competitor of Midwest Towing, and told him she believed Midwest was getting a disproportionate number of the towing calls dispatched by Pendleton County. Miles encouraged her to call the Pendleton County Attorney, Donald Wells. She did so, expressing her desire to have the county dispatcher, Rebecca Wolfe, fired for her actions.

On November 23, 2002, Melissa Steinkamp filed a petition for dissolution of her marriage to Glenn. She testified that, at the instruction of her divorce attorney after informing him that the couple had not filed income tax returns for the past several years, she took possession of the business computers for Midwest Towing so that her lawyer could examine Glenn's income for purposes of child support. To obtain the computers, on November 26 she broke down the door to the business office, breaking her collarbone in

the process. She took possession of a laptop and a desktop computer, and took them with her to the dental office in Ft. Thomas, Kentucky, where she worked.

After taking the computers to her workplace, Melissa called her divorce attorney to inform him of such. However, she had also reported to her counsel that she believed the computers contained child pornography, as she had observed photos of a naked child she did not recognize displayed on Glenn's computer monitor when she entered the office. She testified that because of her report of possible child pornography, her attorney refused to take the computers from her and instructed her to contact the police.

Melissa Steinkamp contacted County Attorney Wells and informed him that she had computers in her possession containing evidence of criminal wrongdoing in the nature of failure to file tax returns, towing invoice records for the excessive dispatch calls she believed the business had received, and possible child pornography. Following Wells's discussion with Melissa Steinkamp, he contacted the County Detective he had recently hired, Peter Samples, and suggested he call Ms. Steinkamp. Samples had just been appointed County Detective on November 19, 2002.[1]

Samples spoke with Melissa in person and by telephone on November 27, 2002. Samples acknowledged that when Ms. Steinkamp contacted the County Attorney's Office, she told them she suspected Glenn was having an affair with Ms. Wolfe, that she was

---

[1]A Kentucky statute that had just gone into effect on July 15, 2002, K.R.S. § 69.360, created the position of county detective.

A county attorney may, as funding allows, employ one (1) or more county detectives.
. . . They shall assist the county attorney in all matters pertaining to his office in the manner he designates and shall assist him in the preparation of all criminal cases in District Court by investigating the evidence and facts connected with such cases.

K.R.S. § 69.360(1).

divorcing him, and that she wanted to turn Glenn in for all of the illegal activity that both of them had been involved in. When he first spoke with her, Ms. Steinkamp informed him she had taken the computers and that her attorney did not want them because of suspected child pornography after she told him she had previously observed images of a naked child on the computer. She also reported that Glenn was running a salvage title scheme from the tow company. Melissa advised he had fraudulently acquired title to approximately 100 of her estimated 500 vehicles on his salvage lot by signing the names of other persons to title application documents. Melissa said she knew this because she had personally participated in the fraud by having titles placed in her name, by notarizing titles placed in others names that had been signed by Glenn, and by personally taking some of the title paperwork to Frankfort. She also told Samples that she and Glenn had not filed income taxes since 1999. She told him about having the computers and of her belief that the computers would contain evidence of all of this reported illegal activity.

After indicating she was willing to be interviewed at her work, Samples went to the dental office, interviewed her further for more detail of these activities, and asked if she was willing to sign a sworn statement regarding her allegations, which she agreed to do at a later date with her attorney present. This same date, Ms. Steinkamp also gave Samples the two computers she had in her possession.

Following his interview with Melissa Steinkamp, Detective Samples contacted the Chief of Butler, Kentucky, Police, Defendant Kenneth Hale, to assist him with the investigation.[2] Samples asked Chief Hale if the computers he had received could be stored

_____

[2]It seems Samples had previous professional interactions with the Butler Police Department in that prior to his hire as County Detective, Samples had worked for nine years as a police

in the City of Butler's evidence locker, as the Pendleton County Attorney's Office had no evidence locker. Chief Hale agreed, and Detective Samples turned the computers over to Hale on November 27, 2002, for placement in the City's locker.

The record reflects that Samples and Hale worked together on the investigation. Samples handled the investigative side, with Hale handling the enforcement side because Samples by statute had no arrest powers.[3] In the course of his work as County Detective, Samples communicated and met regularly with County Attorney Wells for purposes of this and the other matters he was investigating as County Detective. To the extent their meetings concerned the criminal allegations against Glenn Steinkamp and Midwest Towing, Chief Hale was also involved in those meetings.

On November 28, 2002, Chief Hale spoke with Melissa Steinkamp, to confirm her personal knowledge of the information and allegations she had reported against Glenn. Ms. Steinkamp told him that she and her attorney were preparing an affidavit regarding the information she had already communicated to Detective Samples about Glenn fraudulently obtaining vehicle titles, receiving a disproportionate number of tow calls through the County

---

constable in the Pendleton County area. Samples testified that when he worked as a police constable, he had been denied access to the County's radio system operated through the County Dispatch Center, the license for which system was held by the Pendleton County Sheriff's Office. Despite prior intervention efforts by the County Attorney and County Judge Executive with the Pendleton County Sheriff to allow Samples to use their radio frequency, he was permitted only to access the dispatchers to run criminal and license checks, but not to use the radio frequency. The Butler Police Department had its own radio frequency and permitted Samples to use theirs.

[3]The authorizing statute provides that county detectives in counties containing a consolidated local government have the power of arrest in the county and the right to execute process statewide. K.R.S. § 69.360(1). However, Pendleton County did not contain a consolidated local government and, therefore, Samples had no authority to arrest.

Dispatch Office, failing to file taxes, and seeing possible child pornography on the computer.

Chief Hale contacted the Kentucky State Police Crime Laboratory about examining the computers for evidence of child pornography, tax evasion, and fraudulent issuance of vehicle titles. The Lab informed him that a warrant was necessary for them to search the computers for evidence of such reported activities.

On December 2, 2002, Chief Hale, relying upon the information communicated to him by Melissa Steinkamp, prepared and signed an affidavit in support of search warrant.[4] The affidavit stated that the computers were in his possession, maintained in the evidence locker of the Butler Police Station. Hale presented the warrant application to Pendleton County Trial Commissioner Robert Balthalter, who issued the search warrant on December 2, 2002, for the two computers. Chief Hale and Detective Samples thereafter drove to the Kentucky State Police Crime Lab in Frankfort and delivered the computers, along with the warrant.

Sometime on or about December 4, 2002, Chief Hale and Detective Samples interviewed Melissa Steinkamp in the presence of her divorce attorney concerning details of her personal knowledge about child pornography on the computers (she reported she had seen it on one occasion), the estimated number and type of vehicles on the property for which she claimed Glenn had procured titles by forging the names of others, and information about illegal tax dealings. Chief Hale visited the acreage of the Midwest

---

[4] The testimony was that with each warrant application sought in the investigation, Hale and Samples met with County Attorney Wells and reviewed the information in support, with an affidavit by Chief Hale and proposed warrant then prepared.

Towing property and observed that the vehicles were arranged generally on the property as she had described.  He contacted her again to confirm the list of vehicles that she stated she had prepared the paperwork on herself and therefore knew they were fraudulently titled and were still on the property.  Hale and Samples also obtained a sworn affidavit prepared by her attorney and confirming her knowledge of the alleged illegal activity, signed by Melissa Steinkamp on December 4, 2002.

On December 9, 2002, Samples and Hale contacted County Attorney Wells about preparing two additional warrant applications and supporting affidavits.  One application was for a further search of the computers for employment records and financial data relating thereto; i.e., wage withholdings.  Although the computers had already been delivered to the state police lab, the lab was requesting a separate warrant be obtained for this additional form of information.  This warrant was issued by Trial Commissioner Bathalter,  with Chief Hale mailing a copy of the additional computer search warrant to the state police crime lab on December 23, 2002.

The other December 9 warrant application was for authorization to conduct a search of the vehicles in the Midwest Towing salvage yard to obtain each vehicle's identification number (VIN), in furtherance of the investigation of Ms. Steinkamp's allegations that some of the cars had been fraudulently titled.  Chief Hale and Detective Samples proceeded to execute this December 9, 2002, search warrant by examining vehicles on the Steinkamp property on three separate occasions, December 13, 17, and 23, 2002.  On December 13, 2002, Hale and Samples went onto the property and commenced compiling a list of VINs from the vehicles.  They did not complete the compilation that day, and Chief Hale proceeded to write "partially executed" on the warrant with the intention of collecting VINs

on the unexamined vehicles at a later date.  On December 17, the two again entered the property to continue executing the search warrant.  When they concluded for the day, Hale again wrote "partially executed and more evidence to be collected later."  On December 23, Hale and Samples once again entered the property to execute the warrant.  They stopped the search reportedly due to inclement weather and other accessibility and manpower issues.  Hale wrote and left a note on the property "Gleen, only customer vehicles may be removed until further notice.  Thank you, Kenneth Hale, 12/23/02."  Hale subsequently wrote "completed" on the warrant and filed it with the Pendleton County Clerk's Office.

As noted, Peter Samples in his position as County Detective, performed the investigative work in this matter, in addition to assisting with processing the search warrants.  The course of his investigation of Melissa Steinkamp's criminal allegations against Glenn including investigation of Ms. Steinkamp's own credibility and reliability. Samples testified he had no personal knowledge of Ms. Steinkamp prior to his initial contact with her at the County Attorney's suggestion, and that he did have some initial concerns about her trustworthiness in light of the fact that she was going through a divorce.  Initially, he informed her that he would need a sworn affidavit from her, which she agreed to provide and subsequently did.  She also expressed willingness to admit her own involvement in the situation while understanding it could lead to criminal charges against her.  She was not initially granted immunity from prosecution.  Moreover, after Mr. Steinkamp brought to Samples' attention that his wife had a history of a psychological condition, Samples discussed this with Melissa Steinkamp, reviewed medical records she provided, and then also discussed the circumstances with a psychologist to discern whether her medical situation might otherwise render her unreliable, untrustworthy, or dishonest.  He also

arranged for Ms. Steinkamp to undergo two polygraph examinations administered by the Cincinnati Police, the reports for which concluded there was no indication of deception by her.

Meanwhile, in the course of Samples' investigation, he also learned more information about the process allegedly used by Mr. Steinkamp for fraudulently titling the vehicles, details that invoked questions about the possible involvement of the Pendleton County Sheriff's Office. More specifically, while Samples was having VINs that had been retrieved via search warrant checked by the state Transportation Cabinet, he learned the names of Pendleton County Sheriff's deputies who had allegedly fraudulently signed title paperwork as having inspected the vehicles after being repaired.[5] This, in turn, raised Samples' suspicion that these persons from the County Sheriff's office were also involved in the purported fraudulent titling done by Glenn Steinkamp.[6]

In January 2003 Pendleton County Judge Executive Henry Bertram and the Pendleton County Fiscal Court became aware through Detective Samples that the number of tow calls directed to Midwest Towing by the County's dispatch program was being

---

[5]Melissa Steinkamp had explained to Hale and Samples that her husband sought out these titles to try and obtain "clean" titles before the law changed in mid-1994, after which titles issued for salvage vehicles that had been repaired would be branded with the term "rebuilt." To obtain a clean title for a vehicle, Steinkamp submitted applications in the names of various persons, at least some of whom were named by Melissa for Hale and Samples, because the state limited the number of vehicle titles that could be issued to any one person. Title issuance also required documentation that the wrecked or salvage vehicle had been repaired, and that those repaired had been inspected and approved by an appropriate public official.

[6]Plaintiffs characterize Samples' interest in the Pendleton County Sheriff's Office and his belief of possible corruption in that Office as the primary motivator for Samples' investigation of Melissa Steinkamp's allegations. They argue that his investigation of the Sheriff's Office commenced immediately upon his contact with Melissa Steinkamp, and that his interest was fueled by his prior strained relationship with the Sheriff's Office.

investigated by Samples and others. Later in January, Samples and County Attorney Wells approached the Pendleton County Sheriff about investigating Glenn Steinkamp for child pornography, reporting to the Sheriff that the state police crime lab had informed them of such being found on Steinkamp's computer. Sheriff O'Hara reportedly refused to investigate on the basis that Melissa Steinkamp could have concocted the situation because she and Glenn were in the midst of a divorce.

On February 4, 2003, Melissa Steinkamp signed a criminal complaint against Glenn, alleging he had attempted to influence her testimony in the pending divorce proceeding by threatening her with physical harm unless she testified a certain way. This same date, Trial Commissioner Balthalter signed a warrant for Steinkamp's arrest for violating K.R.S. § 524.040, intimidating a participant in legal process, based upon Ms. Steinkamp's criminal complaint. Based on this warrant, Chief Hale arrested Glenn Steinkamp on February 6, 2003. The record suggests that during the preliminary hearing following this arrest, Ms. Steinkamp contradicted herself and admitted that the incident she reported never actually occurred. The felony charge against him for allegedly influencing her testimony was dismissed by the Pendleton County District Court on March 11, 2003, for lack of probable cause. During this same February 6 time frame, Melissa also filed a domestic violence petition against Glenn, which petition was ultimately dismissed by a Pendleton County Circuit Court Judge as lacking sufficient evidence.

On April 10, 2003, Chief Hale prepared and signed an affidavit in support of an application for a search and seizure warrant for eight vehicles on the Steinkamp property. The seizure of these vehicles was based on information received from sending the VIN numbers obtained from the prior searches to the state vehicle registration agency.

Following presentation of the application, the warrant was signed by Trial Commissioner Bathalter. In executing the warrant, Chief Hale and Detective Samples located and seized seven of the vehicles. Hale testified that in the course of locating the vehicles listed on the warrant, he noticed the completed warrant contained a numerical typographical error with the VIN number for two of the seven vehicles. It was his belief that the typographical errors were made when the typist in the County Attorney's office prepared the warrant paperwork. The eighth vehicle was identified in the warrant by VIN number corresponding to a maroon Dodge Lancer. Hale testified that while on the property on December 9, 2002, he and Samples tagged a vehicle as #110, photographed it, recorded its make, model and VIN, and its location in the salvage yard. However, when he and Samples returned to the yard on April 10, 2003, this vehicle was in the same location but the #110 tag had been removed, the car had been painted, and the dash, door and radiator identification numbers did not match each other or the VIN they had previously recorded for the vehicle. Hale and Samples concluded that the VIN for the vehicle had been tampered with since their initial search and notation of the vehicle's VIN in December 2002. They proceeded to seize and tow this vehicle as representing the vehicle listed in the warrant by a different VIN.

At the close of business on April 10, 2003, Hale filed a return of warrant, indicating the Dodge Lancer identified in the warrant by its VIN had a different VIN on the dashboard at execution, and that he believed Glenn Steinkamp had altered the VIN of the vehicle and thereby tampered with evidence. Late in the afternoon on April 10, 2003, Chief Hale amended the return to clarify that, in addition to the Dodge, seven other vehicles had been seized and that the VINs for two of vehicles listed in the warrant contained a typographical error. Hale proceeded to note by hand on the warrant's face the correct make, model, year

and VIN for each vehicle listed in the April 10 warrant, other than the Dodge Lancer, and then filed the amended return of warrant on April 11 and served Glenn Steinkamp with a copy.

Detective Samples subsequently showed the Dodge Lancer vehicle to the prior title owners, who provided Samples with the insurance policy they had purchased for the vehicle. This policy displayed the same VIN as had been originally recorded by Chief Hale in December 2002.

On April 30, 2003, an application was submitted to Trial Commissioner Bathalter for another warrant to resume the VIN search of the vehicles in the salvage yard. This application was also supported by another affidavit signed by Chief Hale. Its purpose was to collect VINs that had not been retrieved when executing the original December 9, 2002, warrant, for vehicles in specific areas of the salvage yard that were not searched when the prior warrant was executed. Upon entry on the property, Hale showed the warrant to Glenn Steinkamp to inform him of why they were there.

As this search warrant was being executed, Hale and Samples observed Glenn Steinkamp tow a dark blue car from the area in which they were searching. Following behind him in a separate vehicle was Rebecca Wolff. Hale and Samples tried to catch up to Steinkamp and Wolfe by foot to instruct them to stop what they were doing, but were unable to do so. Hale and Samples contacted County Attorney Wells to discuss what had occurred and how to proceed. Steinkamp returned in the tow truck a few minutes later, with no vehicle in tow. When Hale asked him where he had taken the dark blue car so that they could obtain its VIN, Steinkamp rolled up the truck window and drove away. They then stopped Rebecca Wolfe's separate vehicle and asked her where the car had been taken.

Wolfe stated she was not cooperating and did not have to give them any information. Both Wolfe and Steinkamp were then arrested by Hale for obstructing governmental operations.

Also on April 30, 2003, Chief Hale, after consultation with County Attorney Wells, filed a criminal complaint against Glenn Steinkamp alleging that he had tampered with a VIN for a vehicle Hale processed in executing the April 30 search warrant. In executing that search warrant, Hale observed a pickup truck with evidence tag #519, the VIN for which had been scrapped off. This observation prompted presentation of the criminal complaint charging Steinkamp with obscuring the identity of a machine valued at over $300. An arrest warrant was issued by Trial Commissioner Bathalter based on this criminal complaint, and Steinkamp was arrested by the Kentucky State Police on May 1, 2003, pursuant to this warrant. Although several criminal proceedings having been initiated against Glenn Steinkamp, and a criminal charge having been made against Rebecca Wolfe, there were no convictions against either Plaintiff at the time this action was filed.

Plaintiffs Glenn Steinkamp and Rebecca Wolfe sued Melissa Steinkamp, Detective Peter Samples, Pendleton County, and the City of Butler and Chief Hale, alleging that under § 1983 they were maliciously prosecuted, unlawfully arrested, unreasonably seized, had their due process rights violated, and were subjected to a conspiracy to interfere with their civil rights. Plaintiffs also raised various state-law claims.[7] When Melissa Steinkamp answered suit, she included a counterclaim against co-Plaintiff Rebecca Wolfe for alienation of affection; however, that claim has since been dismissed as barred by Kentucky law (*see* Doc. #14).

---

[7] Melissa Steinkamp was named as a Defendant only as to state-law claims.

At the close of discovery, Plaintiffs moved for partial summary judgment on their constitutional claims. Each of the three categories of Defendants – Pendleton County, the City of Butler and Chief Kenneth Hale, and Detective Peter Samples – also moved for summary judgment as to all claims against each of them. Following oral argument, the Court summarily denied Plaintiffs' motion and granted Defendants' motions, with this written decision to follow.

## II.  Analysis

### A.    Summary Judgment Review Standard

The proper standard for entry of summary judgment is well known. Federal Rule of Civil Procedure 56(c) provides, in pertinent part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.* , 477 U.S. 242, 248 (1986). The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." *Little v. BP Exploration & Oil Co.* , 265 F.3d 357, 361 (6th Cir. 2001).

 "The moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.,* 532 F.3d 469, 483 (6th Cir. 2008). In meeting its burden of establishing an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986), the moving party may rely on any of the evidentiary sources listed in the Rule or may rely upon the failure of the nonmoving

party to produce any evidence that would create a genuine dispute for the jury. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir. 1989).

Once the movant has met its initial burden of establishing that summary judgment may be appropriate as a matter of law, the nonmovant cannot rest on its pleadings, but must instead demonstrate that there is a genuine issue for trial. *See Celotex* , 477 U.S. at 324. "The nonmoving party must 'do more than simply show that there is some metaphysical doubt as to the material facts,' it must present 'significant probative evidence in support of its complaint to defeat the motion for summary judgment.'" *Expert Masonry, Inc. v. Boone County* , 440 F.3d 336, 341 (6th Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986)). "The mere presence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. Essentially, a motion for summary judgment is a means by which to challenge the opposing party to "put up or shut up" on a critical issue. *Street,* 886 F.2d at 1478. If, after reviewing the record as a whole, a rational fact finder could not return a verdict for the nonmoving party based on the evidence construed in its favor, summary judgment should be granted to movant. *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 349 (6th Cir. 1998).

In this case, the parties have filed cross summary judgment motions. This does not alter the standard by which this Court reviews these motions: "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party. *Wiley v.*

*United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991)).

**B.    Plaintiffs' Federal Claims**

The constitutional claims Plaintiffs bring under § 1983 require Plaintiffs plead and prove a deprivation of rights secured by the Constitution or laws of the United States, and that the defendants that allegedly deprived them of those rights acted under color of state law. *Parratt v. Taylor,* 451 U.S. 527, 535 (1981); *Dean v. Byerley,* 354 F.3d 540, 546 (6th Cir. 2004); *O'Brien v. City of Grand Rapids,* 23 F.3d 990 (6th Cir. 1994). At this stage of the case, it is no longer a matter of adequately pleading these requirements and instead, Plaintiffs must be able to point to facts in dispute as to these elements, facts that are genuine and material to a finding of liability. But as noted at hearing and explained below, review of the conduct at issue in this case shows there has been no violation of Plaintiffs' constitutional rights by Defendants. Therefore, there are no viable § 1983 claims and summary judgment as to those claims must be denied to Plaintiffs and appropriately granted to Defendants.

**1.    Fourth Amendment Claims**

Counts II and III of Plaintiffs' Complaint assert Defendants Hale and Samples violated their right to be free from unreasonable seizure by way of their unlawful arrests. Although not expressly delineated in the Complaint, the parties do not dispute that Plaintiff Glenn Steinkamp further maintained in the course of discovery that his federal constitutional Fourth Amendment right to be free from unreasonable searches was also violated. Because these two counts are also an integral part of the analysis of Plaintiffs'

16

claim in Count I for § 1983 malicious prosecution, the Fourth Amendment claims will be considered first.

Fourth Amendment jurisprudence dictates that for a search or seizure of a person or property to be considered reasonable, it must be supported by a warrant premised upon probable cause, absent exceptional circumstances. Probable cause for a search warrant exists "if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *Greene v. Reeves,* 80 F.3d 1101, 1106 (6th Cir. 1996). Probable cause sufficient to support an arrest warrant requires a showing "that the police have 'reasonably trustworthy information ... sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Id.* (quoting *Centanni v. Eight Unknown Officers,* 15 F.3d 587, 592 (6th Cir. 1994)).

In establishing liability under § 1983, Plaintiffs must first demonstrate that Defendants' actions violated a clearly established constitutional right. *Poe v. Haydon,* 853 F.2d 418, 423 (6th Cir. 1988). Each of the warrants in this case was issued by Trial Commissioner Bathalter. Law enforcement may rely on judicially secured warrants for immunity from civil liability unless the circumstances are such that the warrant was so lacking in indicia of probable cause, law enforcement's reliance upon the existence of probable cause was unreasonable. *Malley v. Briggs,* 475 U.S. 335, 345 (1986).

For each of the warrants at issue in this case, Steinkamp and Wolfe contend the warrants were improperly secured because of factual omissions. According to Plaintiffs, "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the Judge such that but for these falsities the

17

Judge would not have issued the warrant." *Yancey v. Carroll County,* 876 F.2d 1238, 1243 (6th Cir. 1989). "Falsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional." *Hinchman v. Moore,* 312 F.3d 198-205-06 (6th Cir. 2002). Officers may be held liable under § 1983 for an illegal search or seizure where the officer "knowingly and deliberately, or with a reckless disregard for the truth" makes "false statements or omissions that create a falsehood" and "such statements or omissions are material, or necessary, to the finding of probable cause." *Vakilian v. Shaw,* 335 F.3d 509, 517 (6th Cir. 2003) (citing with approval *Wilson v. Russo,* 212 F.3d 781, 786-87 (3d Cir. 2000)). In addition to claimed omissions by Defendants, Plaintiffs also raise particular aspects of specific warrants as additional grounds for rendering them invalid on their face or in execution. Therefore, review of the circumstances surrounding each of the warrants will be considered.

One other general clarification point with respect to Plaintiffs' Fourth Amendment claims. In his filings, Detective Samples points out that he has no potential liability for unreasonable search or seizure because, having no power to arrest in his role as County Detective pursuant to K.R.S. § 69.360, he made no arrests himself nor was he an affiant for any of the search warrant applications. The Court, however, does not view his involvement in the search and seizure claims through such a narrow lens. Rather, the case law suggests that law enforcement officials involved or instrumental in the conduct bringing about an alleged constitutional violation are also subject to having their conduct scrutinized for potential liability. *See Hall v. Shipley,* 932 F.2d 1147, 1154 (6th Cir. 1991) (discussing officer's level of responsibility and involvement determine whether he may be subjected to § 1983 liability, and rejecting "lack of personal involvement" defense). Thus, it is not

enough for Detective Samples to merely point to Chief Hale as the official signing the search warrant applications and executing the arrest warrants. The conduct of both of these public officials is therefore considered in the context of each of the allegedly invalid search warrants obtained on December 2 and December 9, 2002, and April 10 and April 30, 2003, and then executed by Chief Hale and Detective Samples, along with the February 6 and May 1, 2003, arrests of Glenn Steinkamp and the April 30, 2003, warrantless arrests of both Plaintiffs.

### a. December 2, 2002, search warrant for computers

Trial Commissioner Bathalter on December 2, 2002, signed a warrant allowing for search of the two computers turned over to Samples by Melissa Steinkamp. According to this warrant, the computers could be searched for evidence and information concerning: wrecker or tow truck calls and services; income and expenses of Midwest Enterprises; Midwest Towing or Glenn Steinkamp's acquisition and ownership or possession of motor vehicles; motor vehicles placed in Melissa Steinkamp's name or whose title paperwork had been prepared or notarized by her; vehicle transactions in the names of persons Melissa Steinkamp had identified as individuals whose names Glenn had forged on title applications and affidavits; and child pornography.

The issuance of this search warrant was supported by an affidavit of Chief Hale. That affidavit sets forth information possessed by Chief Hale, which information had been received from Melissa Steinkamp directly or from Detective Samples in the course of his investigative efforts. The affidavit detailed that Melissa and Glenn were divorcing, that she and her husband own and operate Midwest Enterprises, that she believes her husband has been involved in criminal activity by failing to file tax returns, obtaining titles to motor

vehicles by conspiring with or being facilitated by others in presenting false documents, and possessing child pornography. It further detailed that Ms. Steinkamp had removed two computers co-owned with her husband and delivered those computers to Detective Samples, who turned them over to affiant for secured placement in the Butler Police Station. Finally, the affidavit described details provided by Ms. Steinkamp as to how she came to know of the alleged criminal conduct, including her knowledge of and involvement in getting the false salvage titles before the July 1994 legal change in the disclosure required on such titles, awareness of getting a higher number of wrecker calls from the county dispatch than under the county's call rotation rules and regulations, general awareness that the business transactions had been of enough significance to require tax return filings yet none had been made to her knowledge, and having seen pictures of a naked child displayed on the computer monitor used by her husband.

The facts set forth in the affidavit establish probable cause to believe that evidence of forging title applications, of tax violations, and of receiving child pornography might reasonably be found on the computers. Hale's affidavit related information from Melissa Steinkamp of not only her observation and awareness of Glenn's actions in submitting applications for salvage titles to Kentucky's Bureau of Motor Vehicles wherein Glenn had signed names other than his own, but also her own involvement in the process by notarizing signatures. Moreover, Glenn Steinkamp does not dispute these allegations, but instead defends them by claiming he had verbal permission to sign. These arguments notwithstanding, the information provided by Melissa Steinkamp provided probable cause

to believe that Glenn Steinkamp had violated K.R.S. § 186A.990[8] and/or K.R.S. § 516.030(1)(b)[9] and that evidence of such would be found on the computers.

The application also contained probable cause to believe evidence of Steinkamp's tax violations might reasonably be found on the computers.  Melissa Steinkamp reported to Samples and Hale that she was involved in the operation of their business, from her involvement had come to believe that the business was receiving a disportionate number of towing calls from the county through the dispatch service, that such business volume had generated significant income or at least reasonable to conclude that tax filings would be appropriate, but that she and Steinkamp had not filed income taxes in the previous three years.  In the course of this proceeding, Glenn Steinkamp does not dispute the allegations that tax returns had not been filed since 1999.

As for the statements concerning possession of child pornography, Ms. Steinkamp reported to the officers that she had walked in on Steinkamp when he was viewing images of a naked child whom she did not recognize to be a family member posed provocatively

---

[8]     Under K.R.S. § 186A.990:
Any person who knowingly gives false, fraudulent, or erroneous information in connection with an application for the registration, and when required, titling of a vehicle, or any application for assignment of a vehicle identification number, or replacement documents, or gives information in connection with his review of applications, or falsely certifies the truthfulness and accuracy of information supplied in connection with the registration and when required, titling of a vehicle, shall be guilty of forgery in the second degree.

[9]     Under K.R.S. § 516.030(1)(b):
A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument which is or purports to be or which is calculated to become or to represent when completed:
A public record or an instrument filed or required or authorized by law to be filed in or with a public office or public employee.

on the subject computers. That statement supports probable cause to believe that Glenn Steinkamp had violated federal child pornography laws. The presence of such images was confirmed on laboratory examination of the computer, which Mr. Steinkamp does not dispute but rather defended by alleging the images were placed there by Ms. Steinkamp. But the circumstances as communicated to Chief Hale by Melissa Steinkamp, and then conveyed to the Trial Commissioner by affidavit, provided probable cause to believe that Steinkamp was guilty of receiving or possessing child pornography, and that evidence thereof would be found on the subject computers.

Simply stated, Defendants Hale and Samples have established probable cause existed for the issuance of the December 2, 2002, warrant to search the computers. Moreover, the assertions made by Glenn Steinkamp to try and negate probable cause and undermine the constitutional integrity of this warrant are unsound.

Steinkamp complains it was unlawful for Samples to initially take possession of the computers from Melissa on November 27, 2002, and Chief Hale to then take the computer from Samples without first procuring a warrant. It is, however, undisputed that at the time Melissa Steinkamp broke the door lock and entered the towing office, she did so on her own accord, after consultation with her divorce counsel, and without instigation from Hale or Samples. Plaintiff conceded at oral argument that no police encouragement or requested assistance was involved. Her actions at that time were solely those of a private individual, not on behalf of the government, and Chief Hale and Detective Samples are not legally chargeable with that conduct. *See United States v. Lambert,* 771 F.2d 83, 89 (6th Cir. 1985). No investigation was opened by Defendants until after Ms. Steinkamp had given them the computers. Defendants were not involved in nor did they encourage her

to take the computers. Their acceptance of the computers from her did not violate the Fourth Amendment.

Glenn Steinkamp also complains this first search warrant sought December 2, 2002, was defective because the affidavit in support thereof was allegedly based upon Melissa's testimony, yet Melissa did not sign an affidavit until December 4. Ms. Steinkamp's affidavit not existing until December 4 does not negate probable cause for the warrant. Officers routinely rely upon statements and information given by citizens to provide probable cause; there is no requirement that informant information must be provided in written affidavit form before an officer can present his affidavit in support of a warrant application. Similarly, Steinkamp argues that the affidavit for this and the other warrants was presented by Hale, who did not have direct knowledge of what was presented in the affidavit. However, some of the information was in fact acquired directly by Hale. Moreover, a law enforcement affiant is permitted to rely upon information gathered and provided by other law enforcement officers in applying for a warrant.

Next, Steinkamp claims that two warrants were sought from Trial Commissioner Bathalter on December 2, 2002, based on the same affidavit, in violation of *United States v. Bowling,* 900 F.2d 926, 932 (6th Cir. 1990). He maintains that under *Sgro v. United States,* 287 U.S. 206, 211 (1932) this second warrant must be obtained by a separate, adequately supported, affidavit. However, it is not constitutionally impermissible to have two warrants be issued based upon the same affidavit, provided the warrants are for different searches. More importantly here is that what Plaintiff maintains was the issuance of a second warrant on December 2, Defendants maintain is actually but a copy of the only warrant issued on that date. Detective Samples testified that County Attorney Wells has

multiple copies made when presenting a warrant for signature, and the purported second warrant is just a copy of the same warrant signed by the Trial Commissioner. While at oral argument Plaintiff said there were differences that establish they are not merely photostatic copies, the Court has closely examined them and finds they are the same. They both seek to search the same computers for the same information; the judge simply signed more than one copy.

Finally, Plaintiff challenges the warrant's validity for lack of jurisdictional authority, arguing that under Kentucky Supreme Court Rule 5.03, the Trial Commissioner was authorized to approve of a search only in his county of jurisdiction. *Commonwealth v. Shelton,* 766 S.W.2d 628 (Ky. 1989). Plaintiff argues that the search of the computers pursuant to the warrant issued by the Trial Commissioner took place at the state crime lab in Frankfort, outside of his jurisdiction per the Rule. However, *Shelton* involved issuing a warrant to search property in another county. Here, the warrant was issued to search computers in the county of the Trial Commissioner's jurisdiction. That the officer executing the warrant was required to rely upon expertise of another due to the nature of the search, and that expert was located outside of the issuing county, does not run afoul of Supreme Court Rule 5.03 and *Shelton.*

### b.      December 9, 2002, warrant to search computers

Shortly after delivering the computers to the Kentucky State Police (KSP) laboratory for forensic examination, Hale applied for and received a second warrant to search the business computers for employment records and employee tax records and filings. Chief Hale testified that he sought this warrant after the KSP laboratory contacted him about seeking a further search warrant directed more specifically to employment records.

24

This December 9 warrant also is supported by probable cause to believe there had been violations of tax laws by the business and/or Steinkamp and that evidence thereof would be found on the computers. Chief Hale's affidavit submitted in support of the warrant application contained investigative information received from Melissa Steinkamp. Based upon her personal knowledge and observations, she reported her husband had been paying cash to individuals, some identified by name, to operate his tow trucks and had not made withholdings from those funds. She also reported that these types of financial and employment records and information to the extent they existed would be found on the computers, based upon her involvement in the operations. Based on these facts, Trial Commissioner Bathalter found there to be probable cause to issue the requested search warrant.

Once again, Glenn Steinkamp takes issue with the validity of this warrant for various reasons. He continues his protests about Melissa's credibility. However, by the time this warrant was requested, Melissa Steinkamp had executed an affidavit, prepared by her divorce counsel, which confirmed her own involvement in the criminal violations as his spouse and through her own direct conduct. These statements against interest acted to enhance her credibility. Additionally, by this point in time Samples and Hale had been independently investigating some of the information provided by her. Samples had confirmed with both the IRS and Kentucky Revenue Cabinet that Glenn Steinkamp had a history of tax evasion. While not stated in Hale's affidavit, this information is relevant to the officers' opinion about their informing witness in relying upon her reports to seek the subject warrant.

Finally, Plaintiff Steinkamp is also critical of the manner in which this warrant was executed, pointing out that although signed by the Trial Commissioner on December 9, it was not "executed" by Chief Hale until he mailed the warrant to the KSP laboratory on December 23.  However, it was fully disclosed in the application that the computers were in the possession of the laboratory for examination, and there is nothing about the timing of the mailing that renders the warrant infirm.  He also points out that issuance of this follow-up computer search warrant was, like the first search warrant, outside of the Trial Commissioner's jurisdiction.  However, while the warrant stated that the computers were then physically located at the state police lab, the search warrant signed by the Commissioner was issued under, and its return filed with, the Pendleton District Court.  The warrant was issued to Officer Hale.  As previously discussed, although Hale was utilizing the services of an expert that necessitated relinquishing temporary possession to the state police, the property was still within Hale's constructive possession.  Moreover, to the extent Hale's conduct in mailing the warrant were to be construed a violation of Kentucky Supreme Court Rule 5.03, it is technical in nature only rather than rendering such unconstitutional.  *United States v. Leon,* 468 U.S. 897 (1984).

### c.     December 9, 2002, warrant to search the salvage yard

On December 9, 2002, Hale secured a warrant to search vehicles in the salvage yard of the Steinkamp/Midwest Towing property in order to acquire their VINs as evidence that Steinkamp had forged official documents in order to obtain salvage titles from the Kentucky Bureau of Motor Vehicles.

When the warrant was secured, there was probable cause to believe that Steinkamp had forged records or instruments in order to obtain salvage titles, and that evidence

thereof would be located in the salvage yard.  In his affidavit in support of application for search warrant, Chief Hale described by legal description the real estate comprising the salvage yard and indicated that the property in that yard sought to be searched, namely used and/or wrecked automobiles, consisting of evidence in the form of serial numbers necessary "to further the investigation into falsifying motor vehicle and water craft title information."

Hale's affidavit further detailed information in his possession, acquired either directly or from Detective Samples, in support of the submission that evidence of criminal activity was present.  Specifically, as of the date of the warrant application, Melissa Steinkamp had told Samples and Hale that Steinkamp had been forging the names of other persons on title applications that he would then submit to the state agency responsible for vehicle registration. She specifically identified the persons whose names Steinkamp had forged, and claimed to have personal knowledge of the forgery because she had served as notary for some of the transactions, because of her involvement in the operation of the business and because she had taken some of the forged instruments to Frankfort for title issuance. She explained that her husband's motivation in doing this was to obtain titles "clean titles" to as many vehicles as possible before the July 1994 change in the law requiring that the titles issued for rebuilt vehicles so specify, and that there was a limit on the number of titles the state agency would issue to any one person on any given day.  Melissa Steinkamp reported to Samples and Hale that many of the more than 100 vehicles for which Steinkamp had acquired title in this way had not been sold and were still in the salvage yard.  In addition to relying upon communications from Samples and receipt of Melissa Steinkamp's handwritten notes, Hale's affidavit states that he personally drove to and

27

viewed the salvage yard as described by her and then called and spoke with her directly about the circumstances of issuing the titles, her involvement in that process, and that most of the vehicles for which titles had been falsely procured remained in the yard.

These circumstances demonstrate probable cause for the issuance of this warrant. Glenn Steinkamp argues that Melissa's estimate of there being 500 vehicles on the property, which representation was repeated in Hale's affidavit, was so obviously wrong it apparently should have alerted authorities to question the soundness and accuracy of all of the information provided by her. This would be an unreasonable conclusion to reach, given the overall corroboration of the information provided by her at that point, and given the type of information the 500 vehicle estimate constituted. The physical space of the area was significant, large volume of cars on the property was evident, and the 500 is more suggestive of her estimation efforts of what was obviously a high number. Her estimate is not so low as to reasonably suggest that she otherwise was unfamiliar with the property or the salvaged cars stored there, nor has the Plaintiff in fact argued such here. Nor were officials required to disclose or give definitive credibility to investigatory information (received by that time) concerning whether Glenn Steinkamp had permission of other persons to sign the documents. Samples spoke with Joe Tipton, one of the people whose name Melissa said Steinkamp had forged. Tipton confirmed that Steinkamp had signed his name to a title document. The investigating officials were not required to accept this permission at face value, or conclude that it did not therefore amount to a forgery with respect to that particular transaction, or that such permissions were granted in all other title issuance transactions where another's name was used. Nor were they required, before seeking this investigative warrant, to further investigate whether Glenn Steinkamp had

28

other defenses or excuses for signing these documents.  In sum, the circumstances at that time presented Hale with probable cause to seek a warrant to search the salvage yard for evidence that Steinkamp had violated K.R.S. § 186A.990 and/or K.R.S. § 516.030(1)(b).

As for the execution of this warrant, Plaintiff voices significant complaint about the fact that Samples and Hale entered the property on three separate dates to execute the warrant – December 13, 17 and 23.  Chief Hale completed the return on the warrant by noting that it was partially executed on December 13, with a partial list of VINs obtained that date attached and the rest to be collected at a later date.  He made a further notation  of continued execution on December 17, with a list of the VINs retrieved on that date attached.  And finally on December 23 he remarked "completed search warrant on 12/23/02 list of VIN #s are attached.  Completed search warrant on 12/23/02 due to adverse weather conditions and manpower restrictions."

That the officials returned to the property on three occasions to execute the warrant is of no legal help to Plaintiff in challenging the warrant.  There is nothing improper about the officials' conduct in doing so.  The ten-day period for execution Plaintiff relies upon from *Sgro v. United States,* 287 U.S. 206 (1932) was pursuant to a since-repealed federal statute, 18 U.S.C. § 613, incorporated by reference in The National Prohibition Act at issue in that case.  In the case at bar, there was nothing prohibiting the officials from completing the search process on different dates, provided it was reasonable under the circumstances and the officials were reasonably prompt in their efforts to complete the search. Defendants testified that they conferred with the County Attorney about the need for execution of this warrant over a number of days. This was not a situation of officers returning to a completed search, on a separate date, because for example they thought of

another area to search. This was a systematic process by Hale and Samples of documenting each vehicle and its identification number, with the separate dates needed to complete the process on so many vehicle spread over such a large geographic area and in the winter season.[10]

Steinkamp submits that the warrant's issuance was also unconstitutional because the affidavit was signed by the Trial Commissioner, rather than Chief Hale. It is undisputed that Trial Commissioner Bathalter, in processing the application, signed the affidavit in support of the warrant and notarized his own signature, then signed the search warrant as well. Chief Hale testified that the Commissioner's signature on the affidavit was a mistake that occurred because so many copies are made when the application is presented for review and warrant issuance. Chief Hale pointed out that another copy of the affidavit offered in support of the warrant application was, in fact, signed by him. Plaintiff's reliance upon *Ruth v. Commonwealth,* 298 S.W.2d 300 (Ky. 1957) as supporting the invalidation of this warrant is misplaced. *Ruth* is simply directed to the black letter rule that an affidavit in support of search warrant is measured by what appears within the four corners of the affidavit. Here, while there was an affidavit mistakenly signed by the Trial Commissioner, there was also an affidavit correctly signed by Chief Hale which was offered in support of this warrant.

---

[10]Nor in the Court's view is it necessary for officers to defend their choice of dates and search hours in the form of detail Plaintiff demands – documentation of adverse weather conditions if more severe than those tracked by the National Weather Service – because their actions satisfy constitutional muster.

### d. April 10, 2003, search warrant for the salvage yard

On April 10, 2003, Hale applied for a warrant to search for and seize eight specific vehicles from the Steinkamps' salvage yard. As with the previous search warrants, the issuance of that warrant was supported by probable cause, as information was provided to the judicial officer that Steinkamp had forged official documents and had made false representations in order to obtain vehicle titles, with evidence of that conduct located in the salvage yard in the form of these vehicles. More specifically, Hale's affidavit details the information secured in the course of investigation to date that resulted in this conclusion that such criminal conduct was occurring.

Melissa Steinkamp had reported to Samples and Hale that her husband Glenn, in order to obtain "clean" or "unbranded" titles prior to a change in state law, had been filing title documents with the state upon which he had forged the names of others; that he had signed affidavits attesting to repair of in fact unrepaired vehicles; and that these vehicles had not since been repaired and re-wrecked but were still located in the salvage yard in their original, unrepaired condition as they had existed for many years.

In addition to the information provided by Ms. Steinkamp, Detective Samples had spoken with Joe Tipton, one of the persons whose name had been provided by Ms. Steinkamp as having been forged. Although he represented it was with his permission, Glenn Steinkamp had nonetheless signed Tipton's name to the title documents. Hale's affidavit also detailed that he and Samples had been to the salvage yard pursuant to the prior warrant, obtained VINs from the vehicles on site, and Samples submitted those numbers to the state vehicle registration office for purposes of identifying which numbers corresponded with vehicles documented as having been rebuilt, as well as vehicle numbers

31

for any titles issued in the names of persons that Melissa Steinkamp said Glenn had used. Samples requested the state office provide copies of the titles, applications, receipts and other records for those vehicles and, upon receipt of that information, he compared that list of vehicles with the vehicle numbers belonging to the rebuilt vehicles, resulting in the eight vehicles listed on the warrant application. Through the investigative efforts described in the warrant application, these identified vehicles were known to be titled in the names of persons whose signatures Melissa Steinkamp said were forged by her husband, and the vehicles were known to be located at the salvage yard property owned by Glenn Steinkamp.

This information communicated by Hale's affidavit to the issuing official had been further corroborated by Samples' further interview with Ms. Steinkamp to pinpoint the details of how each of the eight vehicles had been titled, who signed what part of the application documents, and what repairs to each vehicle had actually been made, if any. Hale and Samples had directly observed the eight vehicles in the course of executing the December 2002 search warrant, and therefore had personal knowledge that those vehicles had not been repaired, as reported in the title application submissions to the state.

With all of this information at hand and relayed to the Trial Commissioner, the warrant to search for and seize these vehicles was issued on April 10, 2003, and the warrant's issuance was supported by probable cause. Nor did Hale's execution of this warrant violate Plaintiff Glenn Steinkamp's constitutional rights. Hale entered the salvage yard premises and proceeded to identify and seize the eight vehicles listed in the warrant.

Glenn Steinkamp's arguments to the validity of this warrant and its execution are unpersuasive. Factually, he points out that two of the vehicles seized by Hale in executing

the warrant are vehicles with different identification numbers than those stated on the warrant, thereby violating his Fourth Amendment rights. However, the two vehicles are, in fact, the vehicle represented by the VIN displayed in the warrant, with the correction of a typographical error of a digit in one of the vehicle's VIN and a letter in the other vehicle's VIN.[11] These typographical errors were corrected and initialed by Hale on the warrant. Despite Plaintiff's protests to the contrary, Hale's actions in making a handwritten notation of the correction on the face of the warrant does not otherwise destroy the legality of the warrant and constitutional validity of its execution. *See United States v. Hang Le-Thy Tran,* 433 F.3d 472, 481 (6th Cir. 2006) (upholding warrant with partially inaccurate description of location that also contained sufficient accurate information); *United States v. Pelayo-Landero,* 285 F.3d 491, 496 (6th Cir. 2002) (noting "that the standard for determining sufficient particularity of a description in a search warrant 'is one of practical accuracy rather than technical nicety'" quoting *United States v. Bedford*, 519 F.2d 650, 655 (3d Cir. 1975)).

### e.     April 30, 2003, search warrant for the salvage yard

On April 30, 2003, Hale applied for and received a warrant to search for and seize the VINs for vehicles in the Steinkamps' salvage yard that had not had their VIN searched during his execution of the December 9 warrant. The affidavit offered by Chief Hale in support of this request provided the investigatory information he and Samples had

---

[11]The VIN for one of the eight vehicles seized, a maroon Dodge Lancer, did not match the VIN listed in the warrant. This vehicle was nevertheless seized after Hale investigated and established that although the vehicle evidence tag placed by him had been removed, and that parts of the car had been replaced with parts bearing different identification numbers, it was the vehicle listed in the warrant and being evidence tag #110 before being tampered with. Mr. Steinkamp has not articulated a specific challenge to law enforcement's seizure of this vehicle.

assembled to date concerning the salvage yard vehicles titled through false application efforts, information received from Melissa Steinkamp and through their own independent investigation and corroboration.  In particular, the affidavit detailed Hale's procurement and of the April 10, 2003, warrant and the seizure of the falsely titled vehicles identified therein, as substantiation of the reported criminal conduct evidenced by some of the vehicles in the salvage yard.

The affidavit also explained why Hale had not completed his search list during the execution of the prior warrant in December.  He explains that completion at that time was hindered by winter seasonal weather, the sheer number of vehicles, where they were located on the property and the terrain of some of the areas, along with his inability to obtain assistance from any law enforcement officials other than Detective Samples, despite having an initial commitment from the Kentucky State Police.  In particular, Hale states that the Pendleton County Sheriff was approached but expressly refused to assist.[12]

Given that the Defendants' investigative efforts to that date had indeed revealed vehicles acquired through submission of false information to the Transportation Cabinet, there was probable cause to inspect those more remote areas of the salvage yard for additional evidence of further potentially criminal activity with respect to the title issuance

---

[12]He states, "the Sheriff of this County has indicated that he has no interest or intent in investigating or enforcing the law with respect to Glenn Steinkamp.  These statements were made to Detective Pete Samples and/or County Attorney Don Wells on or about 6 February 2003.  Several of said agencies' officers have been known to spend frequent and lengthy blocks of time in, about, or upon the subject premises, several are suspected of improper conduct, or are implicated with respect to conduct of Glenn Steinkamp which is believed to be criminal, either individually or by way of facilitation, solicitation, or conspiracy, and are therefore unavailable."

for those vehicles. Therefore, Hale had probable cause to obtain the warrant ultimately issued on April 30, 2003, by Trial Commissioner Bathalter.

### f. February 6, 2003, arrest warrant for Glenn Steinkamp

Glenn Steinkamp was arrested by Chief Hale on February 6, 2003, pursuant to an arrest warrant issued by Trial Commissioner Bathalter on a criminal complaint for witness intimidation sworn to against him by Melissa Steinkamp on February 4, 2003. To the extent Steinkamp contends that his Fourth Amendment right to be free from unreasonable search and seizure was violated when Hale arrested him on this warrant, he is mistaken.

Hale testified that he was not involved in the preparation of that criminal complaint sworn to by Melissa Steinkamp, nor has Plaintiff offered any evidence to the contrary. Thus, once the arrest warrant was issued, Hale's execution of it and seizure of Steinkamp pursuant thereto is considered reasonable, unless the face of the warrant was so lacking in probable cause as to render Hale's reliance on its issuance unreasonable. Here, there was not.

Steinkamp was arrested on a charge of intimidating a participant in the legal process, in violation of K.R.S. § 524.040. Melissa Steinkamp had alleged that her husband threatened her with physical harm to influence her testimony in their divorce proceeding.[13] These allegations comport with the statutory protection afforded a participant in the legal process who is threatened by one seeking to influence their testimony or opinion. Thus, the complaint provided probable cause for issuance of the warrant by Bathalter, and

---

[13]Melissa Steinkamp also made these assertions as well as allegations that Glenn had threatened her safety in conjunction with her reporting Glenn's alleged criminal activities in a domestic violence petition she filed on February 8, 2003, while her dissolution was pending in the Pendleton County Circuit Court.

Plaintiff points to no evidence that would otherwise suggest Hale was not permitted to rely on what appeared to be an otherwise facially valid arrest warrant. While Plaintiff asserts a vague challenge that Hale's execution of the arrest warrant two days after its issuance was improper, he fails to articulate the legal significance of this contention to the issue of whether Hale's February 6, 2003, arrest of Steinkamp was violative of his Fourth Amendment rights.

### g. April 30, 2003, arrests of Steinkamp and Wolfe

While Samples and Hale were executing a search warrant for VINs of further vehicles at the Steinkamps' salvage yard on April 30, 2003, Hale arrested both Plaintiffs, without an arrest warrant, for obstructing governmental operations in violation of K.R.S. § 519.020.[14] The undisputed facts reveal Hale had probable cause to do so.

Hale and Samples were lawfully on the premises pursuant to the search warrant for them to seek out VINs for additional vehicles in specified areas of the salvage yard. Both Glenn Steinkamp and Rebecca Wolfe were aware of why Hale and Samples were on the premises, the warrant having been shown to Glenn. But as they were conducting the search, they observed Glenn towing a dark blue vehicle away from an area they were searching and down the hill toward the roadway. As Glenn proceeded in the tow truck, he was followed closely by Rebecca Wolfe in another vehicle. Chief Hale and Detective Samples sought to pursue them by foot, but were unable to catch up with them, noting when they reached the bottom of the hill that Steinkamp and Wolfe were nowhere to be

---

[14]The statute provides that "[a] person is guilty of obstructing governmental operations when he intentionally obstructs, impairs or hinders the performance of a governmental function by using or threatening to use violence, force or physical interference."

found.  However, when both Plaintiffs returned to the salvage yard a few minutes later, Hale attempted to question Steinkamp about where he had taken the towed vehicle so that its VIN could be documented.  Steinkamp refused to answer, rolled up the window of his tow truck and drove away down the hill.  He was arrested shortly thereafter, after the Kentucky State Police's persuaded him to exit his barn and present himself.  And Hale also sought to question Ms. Wolfe about where the dark blue vehicle had been taken, but she also refused to respond and was placed under arrest by Hale.

Probable cause to effect a warrantless arrest requires that the facts and circumstances within the officer's knowledge be sufficient to warrant a prudent person, or one of reasonable caution, in believing that the suspect has committed, is committing, or is about to commit an offense.  *Michigan v. DeFillippo,* 443 U.S. 31 (1979).  Proof of probable cause is significantly less than that required to establish guilt.  *Criss v. City of Kent,* 867 F.2d 259 (6th Cir. 1988).  Based on Steinkamp's removal, with the assistance of Wolfe, of a vehicle for which both knew Hale and Samples were seeking a VIN pursuant to a valid search warrant, and their refusal to allow Hale access to the vehicle or divulge its location, there existed probable cause to believe that Glenn Steinkamp and Rebecca Wolfe were intentionally interfering with the execution of the April 30 search warrant.  *See also Brown v. Commonwealth,* 263 S.W.2d 238 (Ky. 1954) (finding probable cause to indict for obstructing governmental operations where defendant removed vehicle while deputy sheriff was searching it pursuant to a warrant).  For these reasons, Plaintiffs' constitutional challenge to their April 30, 2003, arrests is unfounded.

### h. May 1, 2003, arrest of Glenn Steinkamp

Steinkamp was arrested by the Kentucky State Police on May 1, 2003, and includes this arrest in his Fourth Amendment seizure claim. The Uniform Citation completed by the officer reflects that Steinkamp was arrested on three warrants, at least two of which have been referred to by Plaintiff in this civil proceeding.

One of the warrants was issued by Commissioner Bathalter pursuant to a criminal complaint of April 30, 2003, sworn to by Chief Hale and notarized by County Attorney Wells. This complaint charged Steinkamp with obscuring the identity of a machine, in violation of K.R.S. § 514.120.[15] Chief Hale swore out this criminal complaint based upon information learned in the course of executing the April 30, 2003, search warrant of the salvage yard. The return on that warrant states that on that date, he observed and seized from the salvage yard premises a Chevrolet S-10 or GMC S-15 pickup truck tagged with evidence tag # 519 from which the VIN had been scrapped off.

Another of the warrants was issued pursuant to a criminal complaint of April 10, 2003, sworn to by either Chief Hale or Detective Samples and notarized by County Attorney Wells. This complaint charged Steinkamp with tampering with physical evidence, in violation of K.R.S. § 524.100.[16] In executing the December 9, 2002, warrant, Samples and

---

[15]The statute reads, in relevant part:
"A person is guilty of obscuring the identity of a machine or other property when he: Removes, defaces, covers, alters, destroys, or otherwise obscures the manufacturer's serial number or any other distinguishing identification number or mark upon any automobile or other propelled vehicle, machine, or electrical or mechanical device, or other property (including any part thereof) with intent to render it or other property unidentifiable[.]"

[16]This statute reads, in relevant part:
"A person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instituted, he: (a) [d]estroys, mutilates,

Hale tagged a vehicle as #110, a maroon Dodge Lancer, photographed it, and recorded its VIN, make, model, color, and location in the yard. However, when they returned to execute the April 10, 2003, search and seizure warrant, this vehicle was in the same location but the #110 evidence tag had been removed. The VINs on the vehicle's dashboard, door, and radiator also did not match each other or the VIN recorded by Hale and Samples in executing the December 9 warrant. This discrepancy was noted on Chief Hale's filing of his return on the April 10, 2003, warrant.

To confirm that Glenn Steinkamp had altered the VIN of the Dodge Lancer, Detective Samples showed the vehicle to its previous owners, identified by Samples through records provided to him by Kentucky's Transportation Cabinet. The prior owner identified the vehicle based on holes he had drilled in the dashboard and the car's interior to install stereo speakers. The owner gave Samples a copy of an insurance policy he had held on the vehicle, and that policy listed the same VIN that Samples and Hale had documented in executing the December 9 warrant. It appears from the record that, based upon this follow-up by Samples, a further criminal complaint was then sworn to by him or Chief Hale on April 20, 2003, and notarized by the County Attorney's office, for obscuring the identity of a machine in violation of K.R.S. § 514.120, with an arrest warrant being issued. It further appears that this is also an arrest warrant referred to on the May 1, 2003, Uniform Citation as having been executed by the state police.

---

conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding[.]"

As to Steinkamp's May 1, 2003, arrest on these warrants, the seizure itself was effected by the Kentucky State Police and not Hale or Samples. However, to the extent that Hale and Samples were involved in bringing about that arrest through their efforts in securing the issuance of the arrest warrants, the circumstances described above establish that for each judicially authorized warrant, there existed probable cause to support the stated charge of tampering with physical evidence and/or obscuring the identity of a machine. As such, to the extent Steinkamp's Fourth Amendment claim against Samples and Hale is premised upon his May 1, 2003, arrest pursuant to the warrants secured by them, no constitutional violation occurred.

### 2. Qualified Immunity

Chief Hale and Detective Samples each argue in the alternative that they are entitled to summary judgment on the basis of qualified immunity. "Government officials acting in their official capacities are entitled to qualified immunity for those discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Feathers v. Aey,* 319 F.3d 843, 847 (6th Cir. 2003) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The inquiry into whether a government official is entitled to qualified immunity includes: (1) whether the plaintiff has established facts that demonstrate that the defendant's conduct violated a constitutionally protected right; and, if so, (2) whether that right was clearly established such that at the time the act was committed, a reasonable official would have understood that his behavior violated that right. *Pearson v. Callahan,* 555 U.S. 223, ___, 129 S. Ct. 808, 816 (2009). But with respect to Plaintiffs' claims against Hale and Samples in their individual capacities for unlawful searches and/or seizure, the Court has already concluded above that no

constitutional violations occurred in the officials' procurement and execution of the search warrants and each arrest of Defendants. Thus, as no violations of constitutionally protected rights occurred, analysis of Defendants' qualified immunity defense is unnecessary.

### 3. Section 1983 Malicious Prosecution Claim

Plaintiffs also assert a § 1983 claim against Chief Hale and Detective Samples under the theory that they were maliciously prosecuted by Hale and Samples. This claim is asserted separately and in addition to Plaintiffs' claimed Fourth Amendment violations for unlawful search and seizure.

In *Alright v. Oliver,* 510 U.S. 266, 275 (1994) a plurality of the Supreme Court found "that the substantive component of the Fourteenth Amendment's Due Process Clause 'with its scarce and open-ended guideposts' may not give arise to a federal constitutional malicious prosecution claim." But the Court acknowledged the Fourth Amendment would be relevant to such a claim. At the time of their briefing and as the parties hereto note in their filings, the legal standard for this civil rights claim had previously not been clearly delineated in the Sixth Circuit, but that the common element among the case decisions on the claim was that it must be supported by a lack of probable cause to justify arrest and prosecution. *Barnes v. Wright,* 449 F.3d 709 (6th Cir. 2006); *Thacker v. City of Columbus,* 328 F.3d 244 (6th Cir. 2003); *Darrah v. City of Oak Park,* 255 F.3d 301 (6th Cir. 2001). This continues to be the case, as evidenced by the Sixth Circuit's recent decision of *Sykes v. Anderson* that formally articulated the elements of such a § 1983 claim. *Sykes v. Anderson,* 625 F.3d 294, 308 (6th Cir. 2010).[17]

---

[17]The Court explained the showing required for such a claim as evidence that (1) "a criminal prosecution was initiated against the plaintiff and that the defendant 'ma[d]e, influence[d], or

Each of the Fourth Amendment search and seizure violations advanced by the Plaintiffs against Chief Hale and Detective Samples were reviewed in detail hereinabove. The procurement and execution of each of these warrants, as well as the warrantless arrests of Glenn Steinkamp and Rebecca Wolfe on April 30, 2003, were supported by probable cause, as fully discussed above.

Nevertheless, Plaintiffs' continued advancement of this claim seems to also rest on their belief that the officials' overall course of conduct, when viewed as a whole, demonstrates that they were wrongfully targeted and prosecuted because of improper motives of Defendants. More particularly, they argue that Melissa Steinkamp was motivated by her anger and need to retaliate over knowledge of Glenn's affair as well as her desire to succeed in her divorce proceedings. However, Ms. Steinkamp is not a "state actor" for purposes of Plaintiffs' federal constitutional claims and is not a named Defendant to this § 1983 malicious prosecution claim. They also argue that Peter Samples had an "axe to grind" with the Pendleton County Sheriff's Office and was motivated to prosecute them because it gave him the opportunity to investigate the County Sheriff's Office for corruption.

In the end, Plaintiffs' further arguments are misplaced. One, any malicious or ulterior motives of law enforcement officials is not relevant to analysis of this claim. *See Sykes,* 625 F.3d at 309-10 ("[t]his circuit has never required that a plaintiff demonstrate

---

participate[d] in the decision to prosecute'"; (2) "there was a lack of probable cause for the criminal prosecution"; (3) "'as a consequence of a legal proceeding,' the plaintiff suffered a 'deprivation of liberty,' as understood in our Fourth Amendment jurisprudence, apart from the initial seizure"; and (4) "the criminal proceeding must have been resolved in the plaintiff's favor." *Sykes,* 625 F.3d at 308-09.

'malice' in order to prevail on a Fourth Amendment claim for malicious prosecution" and that Fourth Amendment jurisprudence "renders 'irrelevant' 'the subjective state of mind of the defendant, whether good faith or ill will'")(quoting *Brooks v. City of Winston-Salem,* 85 F.3d 178, 184 n.5 (4th Cir. 1996). And, perhaps most importantly, Plaintiffs' failure to demonstrate a lack of probable cause for any particular warrant carries through to the overall course of the prosecution against them. It is difficult to envision a scenario where a criminal prosecution generally could be lacking in probable cause sufficient to support a federal malicious prosecution claim, yet each Fourth Amendment encounter involved in the prosecutorial scenario was so supported.

For, while the Fourth Amendment protects not just an unlawful arrest or imprisonment but also "continued detention without probable cause" even though the confinement was imposed pursuant to legal process, the defendant officer must have made, influenced or participated in the decision to prosecute, and that prosecution must have been lacking in probable cause. *Sykes,* 625 F.3d at 308-09 (discussing *Heck v. Humphrey,* 512 U.S. 477, 484 (1994) and *Gregory v. City of Louisville,* 444 F.3d 725, 748-50 (6th Cir. 2006)). Thus, while malicious prosecution under the Fourth Amendment can "encompass[ ] wrongful investigation, prosecution, conviction, and incarceration," it must be supported by a lack of probable cause. *Barnes v. Wright,* 449 F.3d 709, 715-16 (6th Cir. 2006). In the case at bar, Plaintiffs' belief of Defendants' unfair motives to investigate them is simply not the "showing required under federal law" to substantiate a federal § 1983 Fourth Amendment malicious prosecution claim against them.

### 4. Section 1983 Due Process Claim

Plaintiffs also assert a § 1983 claim for alleged violation of their Fifth Amendment right to due process. Their Complaint states as the basis for this claim, in conclusory terms, that they were illegally arrested, subjected to misuse of legal proceedings, and exculpatory information was withheld from them. They do not articulate the legal basis for this claim or the authorities recognizing and defining the evidentiary standard in the context of the circumstances here. Nor is the factual basis for this claim spelled out in Plaintiffs' own summary judgment filings or their response to Defendants' filings.

To the extent this claim is premised upon their claimed unlawful arrests or unlawful prosecutions, those circumstances relate to and have been previously analyzed under their § 1983 Fourth Amendment and malicious prosecution claims. To the extent this claim is premised upon Defendants' claimed withholding of exculpatory information, the claim does not survive summary judgment. Simply put, Plaintiffs have pointed to nothing of a legally exculpatory nature that was unlawfully withheld from them by Defendants when they had a legal obligation to so disclose.

*Brady v. Maryland* held that a prosecutor to disclose to a defendant exculpatory evidence, meaning material evidence that would have a bearing on guilt or innocence of a defendant. *Brady v. Maryland,* 373 U.S. 83, 87 (1963). The purpose of the case rule is to ensure defendant receives a fair criminal trial comporting with his due process rights. The disclosure of exculpatory evidence does not apply with equal force in the context of warrant affidavits. *Mays v. City of Dayton,* 134 F.3d 809, 816 (6th Cir. 1998). "[T]here is no requirement to include exculpatory evidence in a search warrant affidavit." *Seigel v. City*

*of Germantown,* 25 F. App'x 249, 250 (6th Cir. 2001) (citing *Mays,* 134 F.3d at 816).  As

the Sixth Circuit in *Mays* explained:

> The district court's inference that the due process protection provided
> to defendants prior to trial under *Brady* applies to the warrant process under
> the guise of a *Franks [v. Delaware,* 434 U.S. 154 (1978)] analysis, thereby
> entitling the subject of a search warrant to disclosure of any information
> potentially contradicting a finding of probable cause, particularly concerns this
> Court. . . .
>
> . . . [T]he probable cause determination in *Franks,* derived from the
> Fourth Amendment, involves no definitive adjudication of innocence or guilt
> and has no due process implications.  Because the consequences of arrest
> or search are less severe and easier to remedy than the consequences of an
> adverse criminal verdict, a duty to disclose potentially exculpatory information
> appropriate in the setting of a trial to protect the due process rights of the
> accused is less compelling in the context of an application for a warrant.

*Mays,* 134 F.3d at 815-16.

Plaintiffs fail to support their claim by identifying the purported exculpatory evidence

that Defendants failed to disclose or to whom they failed to disclose it.  As pointed out by

Defendant Hale in his briefings, the record indicates that Chief Hale and Detective Samples

communicated with County Attorney Wells regularly and provided him with the  information

obtained from their investigation.  Plaintiffs offer nothing of an arguably exculpatory nature

that Defendants failed to turn over to the prosecutor for trial disclosure under *Brady.*  As

Defendant Hale points out, both Plaintiffs in their discovery depositions testified to their

view that they did not violate the law, and Defendants' failure to dismiss charges when they

come to realize that evidence they have is incorrect violates their due process rights.  In

simple terms, it would seem that Plaintiffs viewed this "incorrect" evidence as exculpatory

evidence, obviously a view of the evidence different from that of law enforcement as to

what conduct constitutes evidence of the crimes for which they were charged, as well as

different from what the law considers "exculpatory" under *Brady.* In addition, Glenn Steinkamp's testimony that this "exculpatory" evidence was improperly withheld by Defendants from Trial Commissioner Bathalter would pertain to challenges to the adequacy of the warrant applications, which has been exhaustively addressed in the Fourth Amendment context as discussed above, rather than as a § 1983 due process violation under *Brady v. Maryland.*

### 5. Section 1983 Conspiracy Claim to Interfere with Civil Rights

Count V of Plaintiffs' Complaint is a § 1983 claim based upon what they describe as a conspiracy to interfere with their civil rights. Both sides move for summary judgment on this claim.

Although Plaintiffs' Complaint contains this Count, their dispositive motion and responsive filings do not identify either the legal standards they rely upon for this claim or the particular facts in the record that evidence such standard. Given Plaintiffs' lack of clarity for this claim, Defendant Hale argues that the only available statutory basis for Plaintiffs' to advance a conspiracy claim is under 42 U.S.C. § 1985, specifically the second clause of subsection (2) or subsection (3). But these subsections, submits Hale, both require a showing of class-based, invidiously discriminatory animus, and Plaintiffs cannot demonstrate that any alleged conspiracy was motivated by class-based, invidious discrimination and have not alleged such a motivation. This much is true; Plaintiffs have not indicated their conspiracy is brought or could be maintained pursuant to § 1985.

To the extent Plaintiffs seek to assert a § 1983 claim based upon the federal law of conspiracy, Defendants Hale and Samples contend such theory is unavailable to Plaintiffs here. Chief Hale argues that this claim by Plaintiffs should be denied as simply repetitive

46

of the allegations contained in Plaintiffs' Complaint generally, citing *Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988). *Jones* involved claims under § 1983 for false arrest, false imprisonment, intentional infliction of emotional distress, and malicious prosecution, as well as conspiracy to commit these wrongs. 856 F.2d at 988. In analyzing the conspiracy claim, the court noted that

> the function of conspiracy doctrine is merely to yoke particular individuals to the specific torts charged in the complaint. The requirements for establishing participation in a conspiracy are the same, however, as in a case (criminal or civil) in which conspiracy is a substantive wrong.

*Id.* at 992. Hale maintains that since Plaintiffs have already alleged the involvement of Defendants in the alleged deprivation of their constitutional rights under the Fourth Amendment, their conspiracy claim serves no additional purpose not served by their other claims.

In looking at whether Steinkamp and Wolfe can maintain a separate conspiracy claim, the Court notes that the Sixth Circuit does recognize a cause of action for civil conspiracy under § 1983. *Spadaford v. Gardner,* 330 F.3d 849 (6th Cir. 2003). That decision describes the standard for this cause of action as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Spadaford,* 330 F.3d at 854 (quoting *Hooks v. Hooks,* 771 F.2d 935, 943-44 (6th Cir. 1985)). In the § 1983 context, the conspiracy takes on an additional dimension, the violation of one's civil rights.

While the Sixth Circuit recognizes this claim, Plaintiffs cannot survive the dismissal of this claim in this case. Plaintiffs argue that Chief Hale and Detective Samples conspired to deprive Plaintiffs of their right to be free of unreasonable search and seizure by state actors as guaranteed to them under the Fourth Amendment, and their right to due process as guaranteed to them under the Fifth Amendment. In addition to these assertions being repetitive of other counts as pointed out by Defendant Hale, these assertions of injuring Plaintiffs by violating their constitutional rights under the Fourth and Fifth Amendments have been previously addressed and rejected herein. Finally, while factually it is undisputed that Hale and Samples worked together in the investigation of the alleged criminal activities of Glenn Steinkamp and Midwest Towing, there has been no showing by Plaintiffs of any evidence of an agreement or plan between Hale and Samples that had as its objective to injure Plaintiffs by depriving them of their constitutional rights by unlawful actions. Mere statements of legal conclusion by Plaintiffs at this procedural stage will not suffice to thwart dismissal of this claim.

### 6.    Section 1983 Claims Against the City and County

Lastly, Counts X and XI of the Complaint assert claims against the City of Butler and Pendleton County for alleged negligent training and supervision of Chief Hale and Detective Samples, respectively.[18]  While facially it is not clear that these were asserted as § 1983

---

[18]Moreover, claims against local government officials in their official capacities is equivalent to a suit against the local government itself. *Kentucky v. Graham,* 473 U.S. 159 (1995). Thus, the official capacity claims against Chief Kenneth Hale and Detective Peter Samples are the equivalent of suing the City of Butler and Pendleton County, thus including those official capacity claims in this analysis.

claims against these government offices, discovery and briefings were couched as such and so the Court will examine these claims as presented.

A plaintiff is not permitted to sue a local government entity under § 1983 under the theory of *respondeat superior. Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 692-94 (1978); *Gregory v. City of Louisville,* 444 F.3d 725, 752 (6th Cir. 2006). To hold a local government entity liable, a plaintiff must show specific wrongdoing on the part of the entity. Municipal liability cannot survive summary judgment unless plaintiff presents evidence that would allow a reasonable jury to conclude that a municipal policy or custom was the moving force behind his constitutional deprivation. *Monell,* 436 U.S. at 694; *Gregory,* 444 F.3d at 752; *City of Canton v. Harris,* 489 U.S. 378 (1989). That is, only when the execution of a policy or custom can be fairly said to represent official policy and it inflicts constitutional injury on an individual that the government entity is responsible under § 1983. *Turner v. City of Taylor,* 412 F.3d 629 (6th Cir. 2005) ("[m]unicipalities are not liable for every misdeed of their employee and agents"); *Bd. of Com'rs v. Brown,* 520 U.S. 397, 407 (1997) (mere showing of simple or even heightened negligence will not suffice to hold government entity liable under § 1983). A plaintiff must identify the municipal policy or custom, connect the policy to the municipality, and show that plaintiff's particular injury was incurred due to the execution of that policy. *Turner,* 412 F.3d at 639.

The governmental policy or custom Steinkamp and Wolfe claim caused their alleged constitutional deprivations is alleged to be the City of Butler's failure to adequately train Chief Hale and Pendleton County's alleged failure to adequately train Detective Samples.[19]

---

[19]It should be pointed out that Pendleton County's primary defense to Plaintiffs' claims against it is that both factually and legally Detective Samples is not its employee or agent, and

49

This type of failure to adequately train may form the basis for a § 1983 claim in limited circumstances. To survive summary judgment on such a claim, Plaintiffs here would have to point to evidence sufficient to establish that (1) the training or supervision was inadequate for the task performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was mostly related to or actually caused the injury. *Ellis, ex rel. Pendergrass v. Cleveland Municipal Sch.,* 455 F.3d 690 (6th Cir. 2006); *Russo v. City of Cincinnati,* 953 F.2d 1036, 1046 (6th Cir. 1992). Plaintiffs must point to a particular deficiency in Defendants' training of its employees, showing that:

> in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. The focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.

*City of Canton v. Harris,* 489 U.S. at 390; *see also Board of Co. Com'rs v. Brown,* 520 U.S. 397, 412 (1997) ("[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal act or disregard to a known or obvious consequence of his action... In

---

therefore the County cannot be exposed to municipal liability for any alleged direct participation in his investigation or failure to adequately train and supervise him. The County points out that by written employment agreement and K.R.S. § 69.360, Samples is considered an employee of the Pendleton County Attorney, his duties derive from and his obligations are owed to the County Attorney's Office, and he is hired, reports to, and is paid by that Office pursuant to K.R.S. § 69.360. Plaintiffs respond by pointing out that ultimately it is the Pendleton County Fiscal Court, pursuant to K.R.S. § 64.530(4), that provides County funding, including the funding of the County Office's Office, rendering the County legally responsible for the County Detective, as well as liability in point of fact, since the County allowed Samples to exhibit apparent authority as the County Detective.

The parties have extensively briefed this point. However, given the conclusion that Samples has not deprived Plaintiffs of their constitutional rights, it is unnecessary for the Court to decide whether federal § 1983 liability is imposed based upon who funds the position, or who exercises actual direction and control over the position of County Detective.

other words, the risk of a constitutional violation arising as a result of the inadequacies and municipal policy must be plainly obvious.").

Applying these standards to the circumstances presented here, it becomes evident that Plaintiffs are unable to survive summary judgment. The argument they present throughout their briefings on this point consists only of general, conclusory allegations; basically, that their constitutional rights were violated, and if Hale and Samples had been adequately trained and supervised their rights would not have been so violated. Throughout discovery, no allegedly unconstitutional policy or custom has been identified by Plaintiffs. Nor do they articulate how it is evidenced that the City of Butler's or Pendleton County's actions were taken with the requisite deliberate indifference to the known or obvious consequences of such policy or custom. They point to no particular training deficiency, and neither do they point to a need for further or different training that was so obvious to the City or County that an argument the officials there were deliberately indifferent to the need could be supported.

The parameters of Plaintiffs' claim of "inadequate supervision" as a basis for imposing municipal liability on the City of Butler and/or Pendleton County is even less clear than their inadequate training argument. The Sixth Circuit has recognized municipal liability may be imposed where the municipality, by its inadequate official supervision, has ratified the actions of an individual officer by failing to investigate and punish the individual officer. *Walker v. Norris,* 917 F.2d 1449, 1457 (6th Cir. 1990); *Marchese v. Lucas,* 758 F.2d 181 (6th Cir. 1985). If Plaintiffs' rely upon this form of federal inadequate supervision as supporting municipal liability, they have certainly failed to define and evidence such. Plaintiffs make passing reference to the fact that Police Chief Hale was admonished by a

state district court judge for his involvement in investigating the allegations against Glenn Steinkamp, as acting outside the jurisdictional boundary of the City of Butler. But Plaintiffs have not otherwise articulated how the City of Butler condoned, encouraged or acquiesced in Hale's "misconduct," thereby exposing it to liability for inadequate supervision. To the extent Plaintiffs are pointing to this reprimand of Hale as evidence he did, in fact, engage in "misconduct" otherwise ratified by the City because it did not stop it, this is not the type of constitutional misconduct to which the standard applies. As discussed above, Hale's actions were not violative of Plaintiffs' constitutional rights, and therefore there was no misconduct the City could have condoned that would subject it to supervisory liability.

As to Pendleton County, the same reasoning applies. Given the Court's prior determination that Samples did not engage in misconduct violative of Plaintiffs' constitutional rights, any purported failures of County officials to adequately supervise Samples by investigating his conduct and appropriately punishing it and thereby ratifying it must fail.

The other form of recognized § 1983 supervisory liability is that against an individual supervisor in that capacity for his or her own active engagement in unconstitutional behavior. *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1948-49 (2009) (each government official is liable only for his or her own misconduct); *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999) (supervisor in some way "directly participated" in the constitutional violation)*; Bass v. Robinson,* 167 F.3d 1041, 1048 (6th Cir. 1999) (individual supervisory liability cannot be premised on the failure to act). Plaintiffs' filing remarks that the Pendleton County Judge Executive "was personally involved" in the investigation of Plaintiffs by his awareness of awareness of Detective Samples' "corruption investigation" of the Pendleton County

Sheriff's Office and by the Judge Executive's involvement in responding to Samples' request for 911 tapes. Plaintiffs also refer to County Attorney Wells being personally involved "in the unconstitutional investigation." But aside from these statements, they do not explain how this involvement supports a claim for individual supervisory liability. They did not name the Judge Executive or County Attorney in their individual capacities as Defendants, nor would these general assertions by Plaintiffs evidence individual supervisory constitutional misconduct.[20]

Therefore, any factual basis for such municipal liability claims being lacking in the record, Defendants City of Butler and Chief Hale in his official capacity, and Pendleton County and Detective Samples in his official capacity, are entitled to summary judgment on these federal § 1983 claims asserted against them by Glenn Steinkamp and Rebecca Wolfe.

### C. Plaintiffs' State-Law Claims

In addition to alleging various theories of federal constitutional injury, Plaintiffs assert a number of claims arising under Kentucky state law. Against Defendants Hale and Samples, they assert a state law abuse of process claim (Count VI), infliction of emotional distress, both intentionally (Counts VIII and IX) and negligently (Count VII), and defamation (Count XV); negligent supervision and training claims against Pendleton County (Count X) and the City of Butler (Count XI); violations of Sections 1, 10, and 11 of the Kentucky Constitution (Counts XII, XIII, XIV); and defamation (Count XVI) and negligent and

---

[20]Moreover, claims against the County Attorney for his involvement in presenting the various warrants would be considered prosecutorial decisions for which he would receive prosecutorial immunity.

intentional infliction of emotional distress (Counts XVII and XVIII) against Melissa Steinkamp. However, as the Court has dismissed Plaintiff's federal constitutional claims, it need not address the merits of summary judgment with respect to Plaintiffs' state-law claims.

Pursuant to § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction if all claims have been dismissed over which there was original jurisdiction.[21] 28 U.S.C. § 1367(c)(3). In the Sixth Circuit, "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment." *Brandenburg v. Hous. Auth. of Irvine,* 253 F.3d 891, 900 (6th Cir. 2001); *see also Moon v. Harrison Piping Supply,* 465 F.3d 719, 728 (6th Cir. 2006) ("a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims"); *Harper v. AutoAlliance Int'l, Inc.,* 392 F.3d 195, 210 (6th Cir. 2004); *Musson Theatrical v. Federal Express Corp.,* 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed.").

The granting of summary judgment for the Defendants and consequent dismissal of the federal § 1983 claims renders this Court's jurisdiction over the remaining state-law claims found in Counts VI through XVIII as solely supplemental under 28 U.S.C. § 1367. Because Plaintiffs' federal claims have been dismissed, the Court declines to continue exercising supplemental jurisdiction over the state-law claims in this matter, consistent with

---

[21]Original diversity jurisdiction in this case is lacking, as all parties are citizens of Kentucky.

28 U.S.C. § 1367(c)(3) and Sixth Circuit authority. Plaintiffs' state-law claims against Defendants will therefore be dismissed without prejudice to being refiled in state court.

### III. Conclusion

For the reasons expressed above, and consistent with the Court's ruling at oral argument as stated in the minute entry therefrom (Doc. #84), **IT IS ORDERED** as follows:

1.      Defendant Pendleton County's motion for order (Doc. #85) and Defendant Samples' motion for entry of a judgment (Doc. #86) are hereby **granted;**

2.      With respect to Plaintiffs' federal constitutional claims, Plaintiffs' Motion for Partial Summary Judgment having been denied, and the Motions for Summary Judgment of Defendants City of Butler and Kenneth Hale, Peter Samples, and Pendleton County having been granted, Plaintiffs' federal constitutional claims are hereby **dismissed with prejudice;**

3.      Plaintiffs' federal claims having been dismissed, the state-law claims contained in Counts VI through XVIII Plaintiffs' Complaint are hereby **dismissed without prejudice** pursuant to 28 U.S.C. § 1367(c)(3); and,

4.      All counts of Plaintiffs' Complaint having been dismissed, this action is hereby **stricken** from the active docket of this Court.

This is a final and appealable Order.

This 31st day of March, 2011.



Signed By:
*David L. Bunning*
United States District Judge